Case 1:08-cv-00600-HSO-LRA   Document 85-6   Filed 04/15/2009   Page 1 of 10
Case 1:07-cv-00793-LTS-RHW   Document 57-2   Filed 06/27/2008   Page 1 of 27
Guice v. State Farm                                    Terry Blalock

Page 1

UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF MISSISSIPPI

SOUTHERN DIVISION


JUDY M. GUICE, INDIVIDUALLY AND ON BEHALF

OF ALL OTHERS SIMILARLY SITUATED,

    Plaintiff,


VERSUS        CIVIL ACTION NO. 1:06cv1 LTS-RHW


STATE FARM FIRE AND CASUALTY

COMPANY and STATE FARM JOHN

DOES One through Ten,

    Defendants.


VIDEOTAPED 30(b)(6) DEPOSITION OF

STATE FARM FIRE AND CASUALTY COMPANY,

TERRY BLALOCK, DESIGNEE

Taken at the Offices of Baker, Donelson,

Bearman, Caldwell & Berkowitz, PC, 4268

I-55 North, Jackson, Mississippi, on

Thursday, July 20, 2006, beginning at

10:10 a.m.

        www.teamsteno.com


**CUMULATIVE EXHIBIT 5**

1  more information became available, some cases
2  you decide you no longer need to hire an
3  engineer. You talked with Dave Randel and
4  Stephan Hinkle and made that decision, correct?
5      A.   Well, Steve Hinkle is the one that
6  initiated that conversation, but that was -- we
7  didn't make a decision to cancel all engineers
8  or to cancel any engineers. We made the
9  decision to have the catastrophe team managers
10 look at each case, one at a time, and make a
11 decision on that individual case as to whether
12 they saw the need to have an engineer involved.
13     Q.   And was that after that wind/water
14 protocol was issued that the conversation
15 between you and Mr. Hinkle and Mr. Randel?
16     A.   That would have been after the
17 wind/water protocol was issued.
18     Q.   And was that going -- the decision of
19 whether you needed to have an engineer was going
20 to be based on the handling under that
21 wind/water protocol; is that correct?
22     A.   Well, the decision on whether we needed
23 an engineer was whether it was going to provide
24 us with information that we needed in order to
25 make a determination on an individual claim.

www.teamsteno.com

Guice v. State Farm                                    Terry Blalock

Page 106

1   Q.   Right. Under the wind/water -- excuse
2   me for interrupting you. Go ahead.
3   A.   And we handled all of our claims under
4   the guideline of the wind/water protocol after
5   it was issued, but --
6   Q.   This one, included?
7   A.   This one, included.
8   Q.   Now, you said that Stephan Hinkle
9   initiated that conversation. I'm talking about
10  the one that you just said where the decision
11  was made to have the CAT team managers make a
12  decision as to whether they still needed an
13  engineer. Was that one conversation where that
14  decision was made?
15  A.   Well, Hinkle advised me in one
16  conversation.
17  Q.   All right. What did he tell you?
18  A.   Basically what I just told you. That
19  was to -- for a team manager to look at each
20  individual claim and make a determination about
21  whether an engineer was needed on that specific
22  claim file.
23  Q.   So that's what you did?
24  A.   And we conveyed -- Dave Randel conveyed
25  that message to his team managers and then they

www.teamsteno.com

Page 121

1  these materials because of this situation from
2  Hurricane Katrina, but you don't personally know
3  that, huh?
4      A.   I know that Steve Hinkle was the one
5  that was involved in authoring it because he was
6  over this area.
7      Q.   Do you know who told Steve Hinkle,
8  prepare a wind -- author a Wind/Water Claim
9  Handling Protocol?
10     A.   I do not.
11     Q.   Do you know why -- well, do you know why
12 the decision was made to have this Wind/Water
13 Claim Handling Protocol for Katrina?
14     A.   As I mentioned just a minute ago, for
15 consistency basis and the claims handling
16 guidelines across the states.
17     Q.   Had there been any other -- had there
18 been a written Wind/Water Claim Handling
19 Protocol prior to this one?
20     A.   Not to my knowledge.
21     Q.   And the whole time that you've been with
22 State Farm, only here because of the combination
23 of wind/water damages these homes sustained from
24 Hurricane Katrina, prior to that, there had not
25 been a written Wind/Water Claim Handling

1  the information that they're offering credible.
2  You know, what was their viewpoint from where
3  they were and they claim to have seen what
4  happened.
5       So there are a lot of other factors that
6  I can't base it on just solely on an eyewitness.
7  There are a lot of factors that are considered
8  on each and every claim. That's why we have to
9  look at each and every claim.
10 MR. PHILLIPS:
11      Q. Right. But you look at each and every
12 claim under this interpretation of the policy;
13 that is, that if the investigation does not
14 reveal independent windstorm damage to separate
15 portions of the property, there is no coverage
16 available under the policy, right?
17 MR. REED:
18      Object to the form.
19 MR. PHILLIPS:
20      Q. I know you've got to look at each and
21 every claim under that, but you look at each and
22 every claim, and if each and every claim
23 investigation does not reveal independent
24 windstorm damage to separate portions of the
25 property, there's no coverage available under

Page 143

1   the homeowners policy; is that correct?
2   MR. REED:
3           Object to the form.
4   MR. PHILLIPS:
5       Q.   You can answer.
6       A.   If the home is taken away by the surge
7   and the policyholder can exhibit reasonable -- I
8   mean, discernible, distinguishable damage, we
9   would pay for it, wind damage. We would pay for
10  that wind damage.
11      Q.   But if the home is taken away by the
12  surge and the policyholder -- conversely, I'm
13  saying now. If the home is taken away by the
14  surge and the policyholder cannot produce
15  credible evidence of discernible wind damage,
16  then you do not pay; is that correct?
17      A.   We would not pay if there was no
18  discernible wind damage.
19      Q.   I understand. And that's under --
20  that's consistent with what's in -- that
21  procedure that you are just saying you followed
22  is consistent with this Katrina Wind/Water Claim
23  Handling Protocol?
24  MR. REED:
25          Object to the form.

www.teamsteno.com

```
 1    well as water.  He said, "Explained to her the
 2    wind damage to her home was indiscernible and
 3    attempted to explain concurrent causation."
 4              Would you tell me what is State Farm's
 5    view of concurrent causation?
 6         A.   Well, it's what is explained by this
 7    protocol here, and this is how we applied this
 8    -- the concurrent causation language in this
 9    policy that you are referring to is how we
10    handled our claims or the way that we applied it
11    was that we would go to the scene and examine
12    it, and if the home was destroyed, or in the
13    absence of flooding, if that home would have
14    still been there, the flooding is not covered,
15    which is what this category says here that you
16    are referring to, that flood is not covered
17    under the homeowners, so if they had a
18    homeowners policy, a flood policy, we would
19    continue with the handling of the flood claim
20    and make that payment.  And if they had wind
21    damage that was discernible, we would pay that,
22    but we're not going to pay for storm surge or
23    flooding from the storm surge.
24         Q.   You are not going to pay for the slab
25    unless -- for the foundation-only claim unless,
```

Case 1:08-cv-00600-HSO-LRA   Document 85-6   Filed 04/15/2009   Page 8 of 10
Case 1:07-cv-00793-LTS-RHW   Document 57-2   Filed 06/27/2008   Page 8 of 27
Guice v. State Farm                                    Terry Blalock

Page 154

1  some way, you can be shown discernible wind
2  damage; is that right?
3      A.   We're -- that is correct.
4      Q.   Now, that's in accordance with what it
5  says in this protocol, right?
6  MR. REED:
7           Object to the form.
8      A.   The protocol goes into a lot of detail,
9  but the application of this interpretation is
10 what I just told you. That's how we handled
11 each and every claim.
12 MR. PHILLIPS:
13     Q.   All right. And then I see copies of
14 this protocol went to -- it's got a whole list
15 of people who the copies went to. PC claims
16 executive, P&C claims executive. Is that one
17 person?
18     A.   I do not know.
19     Q.   You don't know who that is; is that
20 correct?
21     A.   No. I don't know who that is.
22     Q.   Southern zone executive and claim
23 managers, who is that? Is that like you or --
24     A.   No. That's the names I mentioned to you
25 earlier, Bob Trippel, Joe Fincher, Tyrone Smith

www.teamsteno.com
Monica Schroeder & Associates, Inc.   www.teamsteno.com           (800) 765-8636
2ec0f39a-97d2-4b4c-aebb-577ef37b9c3a

1   would --
2   MR. REED:
3          The only person who's referred to your
4   brief as misleading is you, just then.
5   MR. PHILLIPS:
6          No.  I was referring to your use of that
7   to mislead this witness into making this
8   statement.  Question -- It's on the record.
9   "State Farm applies the contract as it
10  interprets it to deny the claims of class
11  members for losses caused by a combination of
12  wind and water."  And he was misled into
13  testifying that's absolutely not true.
14         When, in fact, what it actually does,
15  the way it interprets the contract is set forth
16  in that letter to the Department of Insurance,
17  and it's correct, isn't it?  The letter is
18  correct on how it interprets the contract, isn't
19  it?
20      A.  The letter is correct on how we applied
21  the interpretation of the policy in the handling
22  of our claims.
23      Q.  And the wind/water protocol is correct,
24  the exhibit that's in there, Exhibit 4, whatever
25  is the wind/water protocol is correct.  That's

Page 227

1  what you -- that's how State Farm interprets the
2  policy, isn't it?
3      A.   The wind/water protocol is the way that
4  we interpret the policy.
5      Q.   All right.  And on that Exhibit 10, if
6  we start reading excerpts from briefs, go ahead
7  and read the first sentence of that section.
8  You already read the heading, where State Farm
9  says the water damage exclusion, including its
10 lead-in language, unambiguously bars coverage
11 for a loss caused by a combination of wind and
12 water.  What's the first sentence say?
13     A.   "State Farm demonstrated in its opening
14 memorandum that the lead-in language to the
15 water damage exclusion bars coverage for any
16 loss in which one or more of the enumerated
17 water perils contributes to the damage."
18     Q.   So the interpretation that's being
19 applied -- the interpretation of the contract by
20 State Farm on Katrina claims, in fact, is
21 exactly what it says in the State Farm written
22 Katrina wind/water protocol and in State Farm's
23 letter to the Department of Insurance, is it
24 not?
25     A.   The letter to the Department of

www.teamsteno.com