**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF MISSISSIPPI**
**SOUTHERN DIVISION**

**DANIEL B. O'KEEFE,**
**CELESTE A. FOSTER O'KEEFE,**
**AND THE DANCEL GROUP, INC.**                                    **PLAINTIFFS**

**VS.**                                    **CAUSE NO. 1:08cv600-HSO-LRA**

**STATE FARM FIRE & CASUALTY**
**COMPANY and MARSHALL J. ELEUTERIUS and**
**JOHN AND JANE  DOES A, B, C, D, E, F, G and H**                **DEFENDANTS**

**NOTICE OF RULE 30(b)(6) VIDEO DEPOSITION**
**AND SUBPOENA DUCES TECUM**

**TO:    ALL COUNSEL OF RECORD**

PLEASE TAKE NOTICE that, pursuant to Rule 30(b)(6) of the Federal Rules of Civil

Procedure, counsel for the Plaintiffs will take the video deposition(s) upon oral examination of

the corporate representative(s) of State Farm Fire and Casualty Company, at a place agreed upon

by counsel for all parties, to be recorded by a Court reporter duly authorized to administer Oaths,

and video graphically, commencing on a date and time to be agreed on by all parties (suggested

by Plaintiffs to be November 18 and 19, 2009), and continuing from day to day until completed

and/or recessed, before a court reporter authorized by law to administer oaths, and video

graphically.   State Farm shall designate a corporate representative(s) prepared to give State

Farm's testimony on the following subjects:

**Business Policy**

1.  Explain the manner in which the premiums were calculated for the subject business
policy, and identify any and all documents that set forth the scale and/or source for determining
same during each year the subject policy was in force.

2.  Identify what the premium would have been under the subject policy business insurance
if Dancel had been named as the sole, and/or as an additional insured during the policy period
including Hurricane Katrina, and if you contend it would have been greater than the amount of
premium that was actually paid for the coverage period including Hurricane Katrina, identify and
describe any and all facts and documents that you contend support this contention.

3.  The identities, by full name and company title, of all persons who participated in making any decision on behalf of State Farm regarding Plaintiffs' claims under their business policy;

4.  The identification of, date of, author and recipients of, description of, contents of, interpretation and application of any and all guidelines, policies, procedures, recommendations, updates, memos, emails, intranet information, communications and documents of any type, hard copy and/or electronic, that addressed and/or governed adjusting, investigating, processing, reviewing, and/or denying claims, such as the claims which are the subject of this litigation (under Plaintiffs' business policy), as they existed at the time the subject claims were adjusted, investigated processed, reviewed, and/or denied;

5.  The identification of any and all documents, and a description of any and all facts that State Farm contends supports its denial of coverage for and/or refusal to pay all or part of any of Plaintiffs' claims that are the subject of this litigation (under Plaintiffs' business policy), or any part thereof, including but not limited to identification of facts and description of documents that State Farm contends support it refusal to pay any or all the compensation Plaintiffs claimed under the following coverage parts of the subject business policy:
    a.    Coverage Part A
    b.    Coverage Part C
    c.    Extensions of Coverage – Debris Removal
    d.    Extensions of Coverage – Extra Expense
    e.    Extensions of Coverage – Valuable Records
    f.    Extensions of Coverage – Exterior Signs

6.  An explanation of the following Coverage Parts provided under the subject policy of insurance, including what types of losses are covered thereunder and what triggers coverage under same; and for each, (1) Whether or not it applies to Plaintiffs' Hurricane Katrina claims, and a description of all facts and documents that support State Farm's position on this issue; and (2) The identification of any and all documents, and a description of any and all facts that State Farm contends supports its decision not to compensate Plaintiffs for losses suffered thereunder:
    a.    Section I, Extensions of Coverage, ¶ 1. Debris Removal;
    b.    Section I, Extensions of Coverage, ¶ 6. Extra Expense;
    c.    Section I, Extensions of Coverage, ¶ 10. Accounts Receivable;
    d.    Section I, Extensions of Coverage, ¶ 11. Valuable Papers and Records;
    e.    Section I, Extensions of Coverage, ¶ 14. Property Off Premises (As Modified by FE-6610, Policy Endorsement (Business));
    f.    Section I, Extensions of Coverage, ¶ 16. Personal Effects; and
    g.    Section I, Extensions of Coverage, ¶ 19. Exterior Signs.

7.  The identification of any and all documents, and a description of any and all facts that reflect efforts State Farm made, if any, to apprise the Plaintiffs about the potential application of, and to investigate potential coverage under each of the following coverage parts under the subject policy of business insurance, and identification of all documents that reflect those efforts:
    a.    Coverage Part A
    b.    Coverage Part C

c.      Section I, Extensions of Coverage, ¶ 1. Debris Removal;
d.      Section I, Extensions of Coverage, ¶ 6. Extra Expense;
e.      Section I, Extensions of Coverage, ¶ 10. Accounts Receivable;
f.      Section I, Extensions of Coverage, ¶ 11. Valuable Papers and Records;
g.      Section I, Extensions of Coverage, ¶ 14. Property Off Premises (As Modified by FE-6610, Policy Endorsement (Business));
h.      Section I, Extensions of Coverage, ¶ 16. Personal Effects; and
i.      Section I, Extensions of Coverage, ¶ 19. Exterior Signs

8.   The identification of, date of, author and recipients of, description of, contents of, interpretation and application of any and all guidelines, policies, procedures, recommendations, updates, memos, emails, intranet information, communications and documents of any type, hard copy and/or electronic, that addressed and/or governed how to calculate or determine (for the time period August 29, 2005 through the present) the amount of loss of income that is recoverable under a business policy such as that at issue in this litigation, including but not limited to those documents that address how many prior months and/or years of income should be considered, and how to determine whether "extra expenses" are recoverable as part of Loss of Income and/or the separate coverage part in the policy for "Extra Expenses".

9.   The identification of, date of, author and recipients of, description of, contents of, interpretation and application of any and all guidelines, policies, procedures, recommendations, updates, memos, emails, intranet information, communications and documents of any type, hard copy and/or electronic, that addressed and/or discussed (for the time period June 1, 1999 through the present) what types of business operations would be covered under business policies (such as the for of business policy sold to the Plaintiffs), where the named insured(s) on the policy is an individual(s).

10.  Whether or not Danny O'Keefe and Celeste O'Keefe are entitled to individual loss of income, if actually suffered, due to interruption of Dancel's business operations at the premises insured under the subject policy of insurance; and identification and description of any and all facts and documents you contend support your position on this issue.

11.  The intent, interpretation, and application of the terms and conditions for coverage under coverage part A of the subject policy form (Buildings), including but not limited to the intent and application of the respective burdens and/or responsibilities of the policyholder(s) versus State Farm; and the resolution of doubts about the cause of loss and/or application of coverage;

12.  The drafting, intent, interpretation, and application of the terms and conditions for coverage under coverage part C of the subject policy form (Loss of Income), including but not limited to the intent and application of the respective burdens and/or responsibilities of the policyholder(s) versus State Farm; and the resolution of doubts about the cause of loss and/or application of coverage;

13.  The identification of, date of, author and recipients of, description of, contents of, interpretation and application of any and all guidelines, policies, procedures, updates, memos, intranet information, communications and documents of any type, hard copy and/or electronic, related to how to interpret and apply the Loss of Income provisions of the subject policy of

insurance and/or exclusions related thereto; including but not limited to any and all such communications, electronic data and/or documents that set forth or discuss a description, itemization and/or interpretation of what types of expenses are recoverable thereunder.

14. A description of the difference between a "business policy" and an "apartment policy", and an explanation of why you referred to the subject policy as an "apartment policy" when tendering certain payments to Plaintiffs thereunder.

15. A description of State Farm's duties to its insured(s), including the Plaintiffs, with regard to advising about applicable and/or potentially applicable coverage parts; and advising about the total dollar amount of coverage potentially available coverage after a catastrophic loss such as Katrina, and identification of any and all documents that reflect and/or memorialize those duties.

16. The specific facts, including identification of any all documents, if any, relied upon by State Farm in support of its decision to tender a payment in the amount of $55,845.43 to the Plaintiffs on or about October 6, 2005, including but not limited to a detailed description of how the payment amount was calculated and/or determined (including a description of any computer and/or estimating programs utilized), specifically what items and portions of Plaintiffs' structure(s) the tendered amount is intended to compensate the Plaintiffs for; and why each specific, remaining portion of the Plaintiffs' structure(s) that suffered a loss during the Hurricane was not paid for at that time;

17. The specific facts, including identification of any all documents, if any, relied upon by State Farm in support of each of the conclusions and representations set forth in State Farm's October 6, 2005 correspondence to the Plaintiffs (whereby State Farm tendered a payment in the amount of $55,845.43).

18. The exact dollar figure that has been paid to Plaintiffs by State Farm for losses to the building premises insured under the subject business policy as of October 23, 2009, and a detailed explanation, including identification and description of all supporting facts and documents, of (1) when each payment was made, (2) the dollar amount of each payment, (3) specifically what losses each payment was intended to compensate the Plaintiffs for, (4) specifically when (by date) and how each payment was actually transmitted to the Plaintiffs and/or their representatives.

19. The specific facts, including identification of any all documents, if any, that State Farm contends prove each item and component of Plaintiffs' insured Rodriguez Street business premises (building) that State Farm has not paid for under the Plaintiffs' business policy was destroyed by flood and/or storm surge.

20. An explanation of why, and the specific facts, including identification of any and all documents, if any, that support State Farm's continuing refusal to compensate the Plaintiffs for the State Farm calculated dollar values for Depreciation, and General Contractor Overhead and Profit on Depreciation, withheld by State Farm from payments to the Plaintiffs under Coverage Part A of the subject business policy.

21. An explanation of why, and the specific facts, including identification of any and all documents, if any, that supported State Farm's refusal to compensate the Plaintiffs for the <u>full</u> State Farm calculated dollar values for Wind Damage to Plaintiffs' Rodriguez Street business premises under coverage Part A of the subject business policy, which State Farm calculated to be $69,017.44.

22. An explanation of all facts on which State Farm claims adjuster Brett Younce's request for, and State Farm claims manager Carl Obie's approval of, an advance to Plaintiffs under the subject business policy in the amount of $75,000, and of total authority in the amount of $137,860.37 on December 15, 2005 were based.

23. Identification of the employer, and a description of the job titles, length of employment, training and experience of Brett Younce and Carl Obie as of December 15, 2005.

24. An explanation of why, and a description of any and all facts supporting State Farm's reasons for, State Farm engaged in a practice of only paying its insureds, including the Plaintiffs, a portion of the total amount of compensation for which authority was granted with regard to compensable losses caused by Hurricane Katrina.

25. An explanation of why, and the specific facts, including identification of any and all documents, if any, that supported State Farm's refusal to pay Plaintiffs benefits in the amount of $75,000 and/or $137,860.37 after State Farm claim management approved an advance of $75,000, and granted total authority in the amount of $137,860.37 (under the subject business policy) on December 15, 2005.

26. Identify and describe any and all efforts that were made to answer the questions posed by Erica Mathews in the electronic claims file entry dated 12/15/05 at 1:44 p.m., and provide the answers to those questions, and identify and describe any and all facts that you contend support those answers.

27. Identify and describe all loss of income coverage that was available to the Plaintiffs under the two weeks "PU" coverage referenced 12/15/05, 2:59 p.m. entry in the electronic claims log for the claims under the subject business policy (Bates Number BUS-24-Z204-060 100101).

28. The specific facts, including identification of any all documents, if any, relied upon by State Farm in support of its failure to make, and/or decision(s) not to make, any additional payments to Plaintiffs under any coverage part of the policy, including loss of income, between October 6, 2005 and March 11, 2006;

29. The specific facts, including identification of any all documents, if any, relied upon by State Farm in support of its decision to tender a payment in the amount of $22,764.00 to the Plaintiffs on or about March 11, 2006, including but not limited to a detailed description of how the payment amount was calculated and/or determined (including a description of any computer and/or estimating programs utilized), <u>specifically</u> what items and portions of Plaintiffs' losses the tendered amount is intended to compensate the Plaintiffs for; and why each specific, remaining portion of the Plaintiffs' structure(s) that suffered a loss during the Hurricane (and/or withheld depreciation) was not paid for at that time;

30. The specific facts, including identification of any all documents, if any, relied upon by State Farm in support of each of the conclusions and representations set forth in State Farm's March 11, 2006 correspondence to the Plaintiffs (whereby State Farm tendered a payment in the amount of $22,764.00).

31. The specific facts, including identification of any all documents, if any, relied upon by State Farm in support of its conclusion that the value of Plaintiffs' loss to the building covered under coverage part A of the subject policy was only $62,860.27 on March 11, 2006;

32. An explanation and description of all facts and documents that you contend demonstrate you actually delivered a payment to the Plaintiffs for benefits due under the subject policy of insurance in the amount of $6,206.57 after State Farm claims personnel determined that amount was due on March 15, 2006, if any.

33. An explanation of why, and the specific facts, including identification of any and all documents, if any, that supported State Farm's refusal to pay Plaintiffs benefits in the amount of $6,206.57 after State Farm claims personnel determined that amount was due on March 15, 2006.

34. Identify and describe all efforts you made to respond to, provide the information requested in, and to answer the questions posed in Mrs. O'Keefes' letter dated March 17, 2006, addressed to Rachel Fisher, including identification and description of all documents that you contend reflect said efforts.

35. Identify and describe all efforts you made to respond to, provide the information requested in, and to answer the questions posed in Mrs. O'Keefes' letter dated March 20, 2006, addressed to Sean Cash and Cynthia Curcio, including identification and description of all documents that you contend reflects said efforts.

36. An explanation and description of all facts and documents that you contend demonstrate you actually delivered a payment to the Plaintiffs for benefits due under the subject policy of insurance in the amount of $5,001.58 after State Farm claims personnel determined that amount was due on March 21, 2006, if any.

37. An explanation of why, and the specific facts, including identification of any and all documents, if any, that supported State Farm's refusal to pay Plaintiffs benefits in the amount of $5,001.58 after State Farm claims personnel determined that amount was due on March 21, 2006.

38. An explanation and description of all facts and documents that you contend demonstrate you actually delivered a payment to the Plaintiffs for benefits due under the subject policy of insurance in the amount of $6,001.58 after State Farm claims personnel determined that amount was due on March 23, 2006, if any.

39. An explanation of why, and the specific facts, including identification of any and all documents, if any, that supported State Farm's refusal to pay Plaintiffs benefits in the amount of

$6,001.58 after State Farm claims personnel determined that amount was due on March 23, 2006.

40. An explanation of why, and the specific facts, including identification of any and all documents, if any, that support State Farm's withholding from the Plaintiffs of the check, made payable to Celeste Foster in the amount of $6,001.58, that was authorized and written on March 25, 2006.

41. The specific facts, including identification of any all documents, if any, relied upon by State Farm in support of each of the conclusions and representations set forth in State Farm's April 27, 2006 denial letter to the Plaintiffs (whereby State Farm denied further coverage under the Plaintiffs' business policy).

42. All facts and documents, if any, that support State Farm's contention that the Plaintiffs had been delivered payments totaling $84,611.01 under their business policy as of May 2, 2006, as set forth in State Farm's electronic claims file.

43. An explanation of exactly and specifically what losses, and description of all facts and documents that you contend support your explanation, the check to the Plaintiffs that was written on May 3, 2006 in the amount of $5,723.37 was meant to provide benefits for.

44. An explanation of why, and the specific facts, including identification of any and all documents, if any, that supported State Farm's withholding from the Plaintiffs of the check, made payable to Celeste Foster and Daniel O'Keefe & Coast Community Bank in the amount of $5,723.37 that was authorized and written on May 3, 2006, for more than a month.

45. A detailed explanation, and identification of any and all supporting facts and documents, of exactly how, by whom, by what manner, and on what date the May 3, 2006 check to the Plaintiffs was actually delivered to the Plaintiffs, and an explanation of your delay in delivering said check after it was issued.

46. Identify and describe all efforts you made to respond to, provide the information requested in, and to answer the questions posed in Mrs. O'Keefes' letter dated May 3, 2006, addressed to Sean Cash, including identification and description of all documents that you contend reflects said efforts.

47. The identification of, date of, author and recipients of, description of, contents of, interpretation and application of any and all guidelines, policies, procedures, recommendations, updates, memos, emails, intranet information, communications and documents of any type, hard copy and/or electronic, that addressed and/or governed investigation of claims, such as the Plaintiffs' claims they were entitled to coverage for interruption of Dancel's business operations, by the State Farm Special Handling Unit as they existed at the time the subject claims investigated;

48. A detailed identification and description of the Special Handling Unit's investigation into the Plaintiffs' claims, including the identification and employer of each individual involved therein, what investigation was performed, what documents were requested and/or reviewed,

what interviews were requested and/or taken, and what conclusions and/or observations and/or results resulted from each said investigation(s).

49. Identify among the documents previously produced to Plaintiffs by State Farm, or produce at the deposition, and discuss the facts and documents supporting all representations on any and all documents generated during and/or as a result of the Special Handling Unit investigation of the Plaintiffs' claims, including all documents contained within the SHU file for the subject claims.

50. The specific facts, including identification of any all documents, if any, relied upon by State Farm in support of each of the conclusions and representations set forth in State Farm's July 5, 2006 denial letter to the Plaintiffs (whereby State Farm denied further coverage under the Plaintiffs' business policy).

51. The specific facts, including identification of any all documents, if any, relied upon by State Farm in support of each of the conclusions and representations set forth in State Farm's July 13, 2006 denial letter to the Plaintiffs (whereby State Farm denied further coverage under the Plaintiffs' business policy).

52. The specific facts, including identification of any all documents, if any, relied upon by State Farm in support of its failure to make and/or decision(s) not to make and actually deliver any additional payments to Plaintiffs under any coverage part of the business policy between June, 2006 and the present;

53. The identification, interpretation and application of any and all sections and subparts of the subject policy of insurance; including but not limited to any and all coverage parts, conditions and/or exclusions, that you contend in any way supports your denial, and/or failure or refusal to pay part or all of the Plaintiffs' insurance claims that are the subject of this litigation;

54. A detailed description of any and all investigation(s) that was done of Plaintiffs' claims from the date of loss through the present, including identification and description of any and all facts, information and documents gathered, considered or created as part thereof, and including the identity and roll played of each individual involved therein.

55. The factual basis and policy justification for any and all conclusions, directives and/or decisions reflected in State Farm's claim logs and/or electronic activity logs for the subject (business policy) claims;

56. A detailed description on what State Farm did to follow through with each of the directives and decisions of the claims personnel involved in the Plaintiffs' (business policy) claims as set forth in the subject claim file and electronic claim file.

57. The identification, dates of, participants in and contents of any and all communications by and between State Farm, its adjusters, agents, representatives, experts, and/or consultants, in any manner related to the Plaintiffs or their (business policy) claims that are the subject of this litigation;

58. The identification, dates of, participants in and contents of any and all communications by and between State Farm, its adjusters, agents, representatives, experts, and/or consultants; and the Plaintiffs; in any manner related to the Plaintiffs or their (business policy) claims that are the subject of this litigation;

59. The identification, dates of, participants in and contents of any and all communications by and between State Farm, its adjusters, agents, representatives, experts, and/or consultants; and any third party; in any manner related to the Plaintiffs or their (business policy) claims that are the subject of this litigation;

60. Whether the losses suffered to Plaintiffs' building(s) insured under Coverage Part A of the subject policy constituted "accidental direct physical loss" as defined by the policy, and description of any and all facts and documents that support State Farm's position on this issue.

61. To the extent State Farm contends that the loss to any part or piece of Plaintiffs' building was caused by an excluded peril, specifically identify each such piece of Plaintiffs' building, and provide any and all facts and identify any and all documents that State Farm contends prove each said loss was caused by the allegedly excluded peril.

62. Whether or not the subject policy of insurance provides loss of income coverage under Coverage Part C necessitated by interruption of business operations due to loss of Plaintiffs' business personal property regardless of whether the Plaintiffs have coverage under coverage part B of the State Farm policy, and description of any and all documents and facts that support State Farm's contention in this regard.

63. Describe any and all investigation you undertook to determine whether Plaintiffs' business personal property at the premises insured under the subject business policy suffered a loss as a result of a covered or excluded peril, and/or whether Plaintiffs business personal property items were covered under the separate policy of insurance that provided coverage therefore, and identify any and all documents and facts related to any such investigation.

64. Whether and to what extent State Farm relied upon the "anti-concurrent causation" and/or "concurrent causation" clause in the subject business policy of insurance as a basis for denying some or all of Plaintiffs' claims.

65. The drafting, intent, interpretation, and application of the terms and conditions for coverage and/or exclusions of coverage under, and application to hurricane claims of, the "anti-concurrent causation" and/or "concurrent causation" clause in the subject business policy of insurance;

66. The identification of, date of, author and recipients of, description of, contents of, interpretation and application of any and all guidelines, policies, procedures, guidelines, updates, memos, emails, intranet information, communications and documents of any type, hard copy and/or electronic, related to how to interpret and apply the "anti-concurrent causation" and/or "concurrent causation" clause in the subject policy of insurance;

67. The total amount of coverage potentially available under all coverage parts of the Plaintiffs' policy of insurance for the losses that occurred during and/or as a result of Hurricane Katrina;

68. A detailed description of how much additional coverage (over and above the base amounts of coverage set forth on the Declarations Page and/or in the policy) is potentially available, as of the date of the deposition, to the Plaintiffs by operation of the Inflation Coverage provisions of the subject policy of insurance, including a detailed description of (1) how much inflation coverage is available for **each** coverage part, (2) what factor(s) was used to calculate that coverage; (3) how the inflation factor was determined; (4) what date was utilized to determine the "particular date" as described in the Inflation Coverage provision of the subject policy; (5) what Index was used as the numerator, and what index was used as the denominator in the equation used to determine the inflation factor, and what dates of published inflation indexes were used to determine those figures for each coverage part; (6) what entity publishes the inflation indexes utilized by State Farm to make these calculations for each coverage part, and how often (and on what dates) were those indexes updated for the geographical region in which the Plaintiffs' property is located  for the time period August 29, 2005 through the present; (7) identification of all documents that reflect the calculations used to determine, and that reflect the amount of calculated inflation protection coverage that was determined by State Farm to be applicable to the Plaintiffs' Hurricane Katrina claims under their business policy; and (8) what were the specific inflation indexes, for each coverage part, for the geographical area in which the subject property is located for each time period on which those indexes were updated between August 29, 2005 and the present.

69. A description of any and all efforts State Farm made to identify eyewitnesses to the Hurricane's destructive forces in the general vicinity of the Plaintiffs' business.

70. The identity of any and all eyewitnesses to Hurricane Katrina known to State Farm to have been located within a ½ mile of the Plaintiffs' business during Hurricane Katrina; a description of any and all efforts State Farm made to interview those witness(es), if any; and the identification, location and content of any and all statements of witnesses, of any type, obtained by and/or submitted to State Farm.

71. The identification of all other State Farm insured properties (homes or buildings) located within a ½ mile of the location of the subject property (Rodriguez Street business premises) for which Hurricane Katrina claims were made.

72. A detailed description of investigations made and how claims were handled and resolved, with regard to Hurricane Katrina claims by other State Farm insureds whose homes or buildings were located within ½ mile of the Plaintiffs' business; including whether or not an engineer was retained or consulted to help determine cause of loss, the conclusions of the engineer(s) if retained, the conclusions State Farm made about the cause of loss to other State Farm insured homes or buildings within ½ mile from the Plaintiffs' business, and how much was paid (including percentage of total coverage) to each such insured for losses to structure(s) under State Farm's insurance policies (of any type), if any;

## Claims Related to O'Keefe's Home

1.    The identities, by full name and company title, of all persons who participated in making any decision on behalf of State Farm regarding the O'Keefe's claims under their homeowner's policy;

2.    The identification of any and all documents, and a description of any and all facts that State Farm contends supports its denial of coverage for and/or refusal to pay all or part of any of the O'Keefe's claims that are the subject of this litigation (under their homeowner's policy), or any part thereof, including but not limited to identification of facts and description of documents that State Farm contends support it refusal to pay any or all the compensation the O'Keefes claimed under the following coverage parts of the subject homeowner's policy:
      a.     Coverage Part A
      b.     Coverage Part B
      c.     Coverage Part C
      d.     Coverage under Option JF
      e.     Additional Coverage – Debris Removal
      f.     Additional Coverage – Temporary Repairs
      g.     Additional Coverage – Refrigerated Products

3.    A description of any and all efforts State Farm made to apprise the O'Keefes about the potential application of, and to investigate potential coverage under each of the following coverage parts under the subject policy of homeowner's insurance, and identification of all documents that reflect those efforts:
      h.     Coverage Part A
      i.     Coverage Part B
      j.     Coverage Part C
      k.     Coverage under Option JF
      l.     Additional Coverage – Debris Removal
      m.     Additional Coverage – Temporary Repairs
      n.     Additional Coverage – Refrigerated Products

4.    A description of State Farm's duties to its insured(s), including the Plaintiffs, with regard to advising about applicable and/or potentially applicable coverage parts; and advising about the total dollar amount of coverage potentially available coverage after a catastrophic loss such as Katrina.

5.    The identification of, date of, author and recipients of, description of, contents of, interpretation and application of any and all guidelines, policies, procedures, recommendations, updates, memos, emails, intranet information, communications and documents of any type, hard copy and/or electronic, that addressed and/or governed adjusting, investigating, processing, reviewing, and/or denying claims, such as the claims which are the subject of this litigation (under the O'Keefes' homeowner's policy), as they existed at the time the subject claims were adjusted, investigated processed, reviewed, and/or denied;

6.    The identification of, date of, author and recipients of, description of, contents of, interpretation and application of any and all guidelines, policies, procedures, recommendations, updates, memos, emails, intranet information, communications and documents of any type, hard copy and/or electronic, that addressed and/or governed the timing and order of adjusting,

investigating, processing, reviewing, and/or denying claims, such as the claims which are the subject of this litigation, when the insured property was known to have been contacted by storm surge, and when the insured was known to have both homeowner's and NIFP policies written through State Farm, as they existed at the time the subject claims were adjusted, investigated processed, reviewed, and/or denied;

7.   The identification of, date of, author and recipients of, description of, contents of, interpretation and application of any and all guidelines, policies, procedures, recommendations, updates, memos, emails, intranet information, communications and documents of any type, hard copy and/or electronic, that addressed and/or governed, and/or that State Farm utilized for the purposes of Hurricane Katrina for, adjusting, investigating, processing, reviewing, denying and/or paying policy limits on NFIP claims for which State Farm was the WYO carrier, such as the NFIP proceeds that were paid to the O'Keefes, as they existed at the time the subject claims were adjusted, investigated, processed, reviewed (if at all), and paid;

8.   A detailed description of the facts, and identification and description of any and all documents related to State Farm's decision to suggest, and State Farm's carrying out of its decision to suggest the use of amended and/or streamlined guidelines for resolving Hurricane Katrina claims to the Federal Government, including the identification and employer of all individuals involved therein.

9.   Identification of any and all documents reflecting, and a detailed description of any and all negotiations, communications and/or correspondence (including emails) by and between State Farm and the Federal Government related to State Farm's proposal to use and/or use of streamlined and/or amended procedures for paying NFIP policy limits on Hurricane Katrina claims.

10. A detailed description of how the procedures State Farm utilized (whether or not formally approved by the Federal Government) to pay Hurricane Katrina NFIP claims for which it was the WYO carrier, such as the O'Keefes' claims, differed from the procedures State Farm used to pay hurricane related NFIP claims prior to Katrina.

11. A detailed description of when State Farm began using some or all of the "new" procedures responsive to paragraph 10, above, to pay Hurricane Katrina NFIP claims in Mississippi, and all identification and description of all documents related thereto.

12. A detailed description of what steps and/or investigation State Farm State Farm deemed sufficient, whether or not formally approved by the Federal Government, to pay Hurricane Katrina NFIP policy limits (such as the limits paid to the O'Keefes) in Mississippi.

13. The identity of, and the application of the estimating program used by State Farm to pay the O'Keefes policy limits under their NFIP policy, and why this particular estimating program was used in the O'Keefe's case.

14. A description of the circumstances under which XACTOTAL was used to facilitate payment of Hurricane Katrina claims investigated by State Farm (under State Farm  homeowner policies AND/OR under State Farm handled NFIP policies), versus a description of the

circumstances under which EXACTIMATE was used to facilitate payment on such claims, including an explanation of the application of and differences between each process and why one program or the other was or was not used on O'Keefes' homeowner and/or NFIP claims.

15. A description of whether or not the O'Keefe's NFIP claim for their home met the criteria to be listed on the *in camera* list State Farm was required to submit to State Farm in the conclusion of the August 10, 2009 Memorandum Opinion in *United States of America Ex Rel. Cori Rigsby and Kerri Rigsby vs. State Farm Insurance Company, et al.*, Cause No. 1:06CV0433 LTS-RHW, attached as "Exhibit 1"; including a description of why the O'Keefe's claim did or did not meet the requisite criteria for inclusion on said list.

16. A detailed explanation of State Farm's basis for determining the O'Keefes' home "can be evaluated as a total loss" under the O'Keefes' NFIP policy on or about September 7, 2005, including identification and a description of any and all facts and documents supporting that determination.

17. A detailed explanation of the reason for, significance and effect of State Farm's decision the O'Keefes' home "can be evaluated as a total loss" under the O'Keefes' NFIP policy on or about September 7, 2005, including a detailed description of how that affected the handling of O'Keefes' NFIP claims and their State Farm homeowner's claims.

18. A detailed description of what the "Xact Total tick sheet for entering risk", that was completed with regard to O'Keefes' insurance claims on their home on or about September 7, 2005, is; including an explanation of the reason for, significance and effect of completing said form, as well as how the completion of said form affected the handling of O'Keefes' NFIP claims and/or their State Farm homeowner's claims.

19. The specific facts, including identification of any all documents, if any, relied upon by State Farm in support of it decision to tender a payment in the amount of $10,000.00 to the O'Keefes on or about September 7, 2005, including but not limited to a detailed description of how the payment amount was calculated and/or determined, specifically what items the tendered amount is intended to compensate the O'Keefes for, specifically what policy the payment was tendered under, and specifically what coverage part(s) of the policy this payment was tendered under, and a detailed description of what investigation had been made to support this payment and of what that investigation proved;

20. Identify and describe any and all facts and documents that support State Farm's conclusion, and the source of State Farm's determination that the value of the O'Keefes' home was $379,912.18 (prior to depreciation), as reflected on the Flood Claim Worksheet dated September 9, 2005.

21. Identify among the documents previously produced to O'Keefes by State Farm, or produce at the deposition, and discuss the facts and documents supporting all representations on the "Adjuster Preliminary Damage Assessment Form", which the Flood Claim Worksheet dated September 9, 2005 represents was completed with regard to the O'Keefes' Hurricane Katrina losses.

22. The specific facts, including identification of any all documents, if any, relied upon by State Farm in support of it decision to authorize an additional payment in the amount of $340,000.00 to the O'Keefes on or about September 12, 2005, including but not limited to a detailed description of how the payment amount(s) was calculated and/or determined, specifically what items of contents and/or dwelling the tendered amount is intended to compensate the O'Keefes for, specifically what policy the payment was tendered under, and specifically what coverage part(s) of the policy this payment was tendered under, and a detailed description of what investigation had been made to support this payment(s) and of what that investigation proved;

23. Identification and a detailed description of all documents and communications, including emails, that discuss or reference in any manner State Farm's intentions and/or plan of action and/or considerations regarding the effect of payment of NFIP policy limits by State Farm under NFIP policies written through State Farm on claims under homeowner's policies written by State Farm for the same property.

24. An explanation of why, and the specific facts, including identification of any and all documents, if any, that supported State Farm's refusal to compensate the O'Keefes for the full State Farm calculated dollar values for Wind Damage to O'Keefes' home under coverage Part A of the subject homeowner's policy, which State Farm calculated to be $6,280.48 or about January 11, 2006.

25. An explanation of why, and the specific facts, including identification of any and all documents, if any, that supported State Farm's refusal to compensate the O'Keefes for the full State Farm calculated dollar values for Additional Living Expenses to which the O'Keefes were entitled under coverage Part C of the subject homeowner's policy, which State Farm calculated to be $3,425.00 or about January 11, 2006.

26. The specific facts, including identification of any all documents, if any, relied upon by State Farm in support of its decision to allegedly tender a payment in the amount of $6,280.45 to the O'Keefes on or about January 16, 2006, including but not limited to a detailed description of how the payment amount was calculated and/or determined (including a description of any computer and/or estimating programs utilized), specifically what items and portions of O'Keefes' structure(s) and/or other losses the allegedly tendered amount is intended to compensate the O'Keefes for; and why each specific, remaining portion of the O'Keefes' structure(s) that suffered a loss during the Hurricane was not paid for at that time;

27. The specific facts, including identification of any all documents, if any, relied upon by State Farm in support of each of the conclusions and representations set forth in State Farm's January 16, 2006 correspondence to the O'Keefes (whereby State Farm allegedly tendered a payment in the amount of $6,280.45).

28. The specific facts, including identification of any all documents, if any, relied upon by State Farm in support of its decision to tender a payment in the amount of $7,705.48 to the O'Keefes on or about January 17, 2006, including but not limited to a detailed description of how the payment amount was calculated and/or determined (including a description of any computer and/or estimating programs utilized), specifically what items and portions of

O'Keefes' structure(s) and/or other losses the allegedly tendered amount was intended to compensate the O'Keefes for; and why each specific, remaining portion of the O'Keefes' structure(s) that suffered a loss during the Hurricane was not paid for at that time;

29. Identify and describe all efforts you made to respond to, answer the questions posed in, and provide the information requested in Mrs. O'Keefes' letter dated March 20, 2006, addressed to Team 13 / Bill, including identification and description of all documents that you contend reflects said efforts.

30. Identify and describe all efforts you made to respond to, answer the questions posed in, and provide the information requested in Mrs. O'Keefes' letter dated April 26, 2006, addressed to Team 13 / Milton, including identification and description of all documents that you contend reflects said efforts.

31. Identify among the documents previously produced to O'Keefes by State Farm, or produce at the deposition, and discuss the facts and documents supporting all representations on the "letter sent to [Mr. (sic) Foster] dated May 24, 2006", referenced in Armanda Trevino's letter to Mr. (sic) Foster dated July 17, 2006.

32. Identify among the documents previously produced to O'Keefes by State Farm, or produce at the deposition, and identify and describe all efforts you made to respond to, answer the questions posed in, and provide the information requested in "Mr. (sic) Foster's" letter dated July 4, 2006, referenced in Armanda Trevino's letter to Mr. (sic) Foster dated July 17, 2006.

33. Identify and describe all efforts you made to respond to, answer the questions posed in, and provide the information requested in Mrs. O'Keefes' letter dated July 4, 2006, addressed to Team 10 / Jody Stanley, including identification and description of all documents that you contend reflects said efforts.

34. The specific facts, including identification of any all documents, if any, relied upon by State Farm in support of each of the conclusions and representations set forth in State Farm's July 17, 2006 denial letter to the O'Keefes (whereby State Farm denied further coverage under the O'Keefes' homeowner's policy).

35. The specific facts, including identification of any all documents, if any, that State Farm contends prove each item and component of O'Keefes' dwelling and dwelling extension that State Farm has not paid for under the O'Keefes' homeowner's policy was destroyed by flood and/or storm surge.

36. The specific facts, including identification of any all documents, if any, that State Farm contends proves, individually and separately, that each separate item of contents on the contents list produced by O'Keefes in this litigation, bates numbers OKEEFE 000018-OKEEFE000033, for which State Farm has not compensated the O'Keefes under their homeowner's policy, was destroyed by flood and/or storm surge.

37. Describe all payment(s) State Farm has made to the O'Keefes under their homeowner's policy to compensate them for losses to the additional structure(s) / Dwelling Extension(s)

covered by the subject policy of insurance and/or the contents thereof, including but not limited to a detailed description of how the payment amount(s) was calculated and/or determined, specifically what items of structure and/or contents the tendered amount(s) is intended to compensate the O'Keefes for, specifically what policy the payment was tendered under, and specifically what coverage part(s) of the policy this payment was tendered under, and a detailed description of what investigation had been made to support this payment and of what that investigation allegedly proved;

38. The total amount of coverage potentially available under all coverage parts of the O'Keefes' policy of insurance for the losses that occurred during and/or as a result of Hurricane Katrina;

39. A detailed description of how much additional coverage (over and above the base amounts of coverage set forth on the Declarations Page) is potentially available, as of the date of the deposition, to the O'Keefes by operation of the Inflation Coverage provisions of the subject policy of insurance, including a detailed description of (1) how much inflation coverage is available for each coverage part, (2) what factor(s) was used to calculate that coverage; (3) how the inflation factor was determined; (4) what date was utilized to determine the "particular date" as described in the Inflation Coverage provision of the subject policy; (5) what Index was used as the numerator, and what index was used as the denominator in the equation used to determine the inflation factor, and what dates of published inflation indexes were used to determine those figures for each coverage part; (6) what entity publishes the inflation indexes utilized by State Farm to make these calculations for each coverage part, and how often (and on what dates) were those indexes updated for the geographical region in which the O'Keefes' property is located for the time period August 29, 2005 through the present; (7) identification of all documents that reflect the calculations used to determine, and that reflect the amount of calculated inflation protection coverage that was determined by State Farm to be applicable to the O'Keefes' Hurricane Katrina claims; and (8) what were the specific inflation indexes, for each coverage part, for the geographical area in which the subject property is located for each time period on which those indexes were updated between August 29, 2005 and the present.

40. A description of any and all efforts State Farm made to identify eyewitnesses to the Hurricane's destructive forces in the general vicinity of the O'Keefe's home.

41. The identity of any and all eyewitnesses to Hurricane Katrina known to State Farm to have been located within a ½ mile of the O'Keefe's home during Hurricane Katrina; a description of any and all efforts State Farm made to interview those witness(es), if any; and the identification, location and content of any and all statements by alleged witnesses, of any type, obtained by and/or submitted to State Farm.

42. The identification of all other State Farm insured properties (homes or buildings) located within a ½ mile of the location of the O'Keefe's home for which Hurricane Katrina claims were made.

43. A detailed description of investigations made and how claims were handled and resolved, with regard to Hurricane Katrina claims by other State Farm insureds whose homes or buildings were located within ½ mile of the O'Keefe's home; including whether or not an engineer was

retained or consulted to help determine cause of loss, the conclusions of the engineer(s) if retained, the conclusions State Farm made about the cause of loss to other State Farm insured homes or buildings within ½ mile from the O'Keefe's home, and how much was paid (including percentage of total coverage) to each such insured for losses to structure(s) under State Farm's insurance policies (of any type), if any;

44. The identification, interpretation and application of any and all sections and subparts of the subject policy of insurance; including but not limited to any and all coverage parts, conditions and/or exclusions, that you contend in any way supports your denial, and/or failure or refusal to pay part or all of the Plaintiffs' insurance claims that are the subject of this litigation;

45. A detailed description of any and all investigation(s) that was done of Plaintiffs' claims from the date of loss through the present, including identification and description of any and all facts, information and documents gathered, considered or created as part thereof, and including the identity, employer and roll played of each individual involved therein.

46. The factual basis and policy justification for any and all conclusions, directives and/or decisions reflected in State Farm's claim logs and/or electronic activity logs for the subject (homeowner's policy) claims;

47. A detailed description on what State Farm did to follow through with each of the directives and decisions of the claims personnel involved in the O'Keefes' (homeowner's policy) claims as set forth in the subject claim file and electronic claim file.

48. The identification, dates of, participants in and contents of any and all communications by and between State Farm, its adjusters, agents, representatives, experts, and/or consultants, in any manner related to the O'Keefes or their (homeowner's policy) claims that are the subject of this litigation;

49. The identification, dates of, participants in and contents of any and all communications by and between State Farm, its adjusters, agents, representatives, experts, and/or consultants; and the O'Keefes; in any manner related to the O'Keefes or their (homeowner's policy) claims that are the subject of this litigation;

50. The identification, dates of, participants in and contents of any and all communications by and between State Farm, its adjusters, agents, representatives, experts, and/or consultants; and any third party; in any manner related to the O'Keefes or their (homeowner's policy) claims that are the subject of this litigation;

51. Whether the losses suffered to O'Keefes' dwelling and dwelling extension insured under Coverage Part A of the subject policy constituted "accidental direct physical loss" as defined by the policy, and description of any and all facts and documents that support State Farm's position on this issue.

52. To the extent State Farm contends that the loss to any part or piece of O'Keefes' dwelling and/or dwelling extension was caused by an excluded peril, specifically identify each such piece of the O'Keefes' dwelling and/or dwelling extension, and provide any and all facts and identify

any and all documents that State Farm contends prove each said loss was caused by the allegedly excluded peril.

53. Whether the losses suffered to O'Keefes' contents insured under Coverage Part B of the subject policy constituted loss caused by "windstorm" as defined and/or contemplated by the policy, and description of any and all facts and documents that support State Farm's position on this issue.

54. To the extent State Farm contends that the loss suffered to any part or piece of O'Keefes' contents was caused by an excluded peril, specifically identify each such piece of the O'Keefes' contents, and provide any and all facts and identify any and all documents that State Farm contends prove each said loss was caused by the allegedly excluded peril.

55. Whether and to what extent State Farm relied upon the "anti-concurrent causation" and/or "concurrent causation" clause in the subject homeowner's policy of insurance as a basis for denying some or all of the O'Keefes' claims.

56. The drafting, intent, interpretation, and application of the terms and conditions for coverage and/or exclusions of coverage under, and application to hurricane claims of, the "anti-concurrent causation" and/or "concurrent causation" clause in the subject homeowner's policy of insurance;

57. The identification of, date of, author and recipients of, description of, contents of, interpretation and application of any and all guidelines, policies, procedures, guidelines, updates, memos, emails, intranet information, communications and documents of any type, hard copy and/or electronic, related to how to interpret and apply the "anti-concurrent causation" and/or "concurrent causation" clause in the subject policy of insurance.

58. The identification, location, content and applicability of any and all documents, of any sort, that discuss the drafting, intent, interpretation, and application of the terms and conditions for coverage under coverage parts A and B of the subject policy form, including but not limited to the intent, definition and application of the phrase "accidental direct physical loss"; the intent, definition and application of the term "windstorm" (in policy language addressing coverage under coverage part B); the intent and application of the respective burdens and/or responsibilities of the policyholder(s) versus State Farm; and the resolution of doubts about application of coverage, and including the identity, including job title and employer, and current contact information, of any and all individuals who participated in the formulation of said documents.

## General:  Applicable to Homeowner's and/or Business Policy Claims

1. All facts and the identification and content of all documents that support each of your affirmative defenses in this cause.

2. The drafting, intent, interpretation, and application of any and all policies, procedures, directives and/or guidelines pertaining to whether engineers should be utilized on Hurricane Katrina claims under business, homeowners' and/or NFIP policies you administered, as they

existed at every time from August 29, 2005 through the present; and specifically including all policies, procedures, directives and/or guidelines on the use and/or mandatory use of engineers where structures had been reduced to slabs and/or "total losses" by the Hurricane, and where storm surge was known to have contacted the premises prior to the end of the Hurricane.

3.   The drafting, intent, interpretation, and application of any and all policies and procedures pertaining to the cancellation and/or revision of engineers reports pertaining to investigation(s) of cause of loss to buildings damaged or destroyed in Hurricane Katrina, and including the identity, including job title and employer, and current contact information, of any and all individuals who participated in the formulation of said policies and procedures;

4.   The drafting, editing, intent, interpretation, and application of the Wind Water Damages Protocol (and/or similar document by any name), and any and all drafts thereof, including but not limited to the drafts attached hereto as "Exhibit 2" (September 10, 2005 Claim Handling Protocol and September 13, 2005 Wind/Water Claim Handling Protocol).

5.   An explanation of why the category titled "Damage to the Property That May Have Been Caused by Either Windstorm or Flood or a Combination of the Two and it is difficult to conclusively determine Causation" was removed from the September 10, 2005 version of the Claim Handling Protocol and/or why it was not included in the September 13, 2005, final version of the Wind/Water Claim Handling Protocol; and an identification and description of any and all facts and documents that support said removal and/or exclusion.

6.   An explanation of why the acknowledgement that "It is our burden to prove that the excluded damage (flood) caused the loss" was removed from the September 10, 2005 version of the Claim Handling Protocol and/or why it was not included in the September 13, 2005, final version of the Wind/Water Claim Handling Protocol; and an identification and description of any and all facts and documents that support said removal and/or exclusion.

7.   An explanation of why the acknowledgement that "Available data indicates the coastal counties of Mississippi and Alabama received substantial damage from Hurricane Katrina from both high velocity winds and an extremely large storm surge" was removed from the September 10, 2005 version of the Claim Handling Protocol and/or why it was not included in the September 13, 2005, final version of the Wind/Water Claim Handling Protocol; and an identification and description of any and all facts and documents that support said removal and/or exclusion.

8.   The drafting, editing, interpretation, content and description of the email, with attachments, attached hereto as "Exhibit 3", including the identity, including job title and employer, and current contact information, of any and all individuals who participated in the formulation of said documents, and the identity, including job title and employer, and current contact information, of any and all individuals and/or entities to whom the subject email was sent (Mark Wilcox email re: form of engineering reports).

9.   Whether or not State Farm expected its claims personnel in Mississippi, including the claims personnel involved with the Plaintiffs' claim, to follow the claims handling guidelines and directives set forth in Mississippi Department of Insurance *Bulletin No. 2005-6* and/or 2006-2.

10. Whether or not claims personnel involved with the Plaintiffs' claim followed and applied the claims handling guidelines and directives set forth in Mississippi Department of Insurance *Bulletin No. 2005-6* and/or 2006-2 with regard to the handling of Plaintiffs' claims, and a description and identification of any and all facts and documents that support your contention these procedures were or were nor followed with regard to Plaintiffs' Hurricane Katrina claims.

11. The identification, location, content and applicability to handling Hurricane Katrina claims in Mississippi, including the Plaintiffs', of the Haag Power Point Presentation presented on numerous occasions in a trailer at the Gulfport claims offices, which was presented on occasion by Shane Abernathy and/or Mick Bergstrom and/or Dave Runge.

12. The description of any and all meetings by and between State Farm and the Mississippi Department of Insurance wherein State Farm's Katrina claims handling practices were discussed, including the date and location of each such meeting, and the identity, including job title and employer, and current contact information, of any and all individuals who attended each such meeting.

13. The formulation and content of any and all information relative to State Farm's Katrina Claims practices communicated to the Mississippi Department of Insurance during each of the meetings identified in item number "40", above, and the identity, including job title and employer, and current contact information, of any and all individuals who participated in the formulation of said response and/or who were concurrently copied with communications related to same;

14. The formulation and content of State Farm's March 31, 2006 response to the inquiry by the Mississippi Department of Insurance, including identification, content and applicability of any and all documents, of any sort, that discuss the drafting, intent, interpretation, and application of said response, and the identity, including job title and employer, and current contact information, of any and all individuals who participated in the formulation of said response and/or who were concurrently copied with communications related to same.

**In accordance with the Federal Rules of Civil Procedure 30(b)(2), Plaintiffs also subpoena and direct Defendants to make originals of the following documents available for inspection and copying at the beginning of this deposition(s):**

1. Any and all documents relating to the above areas of inquiry;

2. Any and all documents reviewed by each designated corporate representative in preparation for his /her testimony;

3. All <u>original</u> hard copy and electronic claims file(s) for the Plaintiffs' Hurricane Katrina claim(s), including but not limited to the claims files for the claims under Plaintiffs' homeowner's policy, the claims files for the claims under Plaintiffs' business policy, <u>and the</u>

"SHU Investigative File" referenced in the 7/14/06, 1:17 p.m. entry in the electronic claims diary for claims under the business policy.

4.   All documents relied upon by State Farm in denying and/or refusing to pay any part of the Plaintiffs' Hurricane Katrina claims;

5.   Any and all guidelines, policies, procedures, updates, memos, intranet information, communications and documents of any type, hard copy and/or electronic, related to how to interpret and apply the Loss of Income provisions of the subject policy of insurance and/or exclusions related thereto; including but not limited to any and all such communications, electronic data and/or documents that set forth or discuss a description, itemization and/or interpretation of what types of expenses are recoverable thereunder;

6.   Audited Financial Statement and/or Statements of Financial Condition for 2005, 2006, 2007, and 2008, for State Farm Fire.

You are invited to attend, and take such part as you deem appropriate.  The 30(b)(6)

deposition(s) shall continue from day to day until complete.

Respectfully submitted, this the 23rd day of October, 2009.

**DANIEL B. O'KEEFE, CELESTE A. FOSTER O'KEEFE, AND THE DANCEL GROUP, INC., PLAINTIFFS**

By: */s/ Christopher C. Van Cleave*
CHRISTOPHER C. VAN CLEAVE (MSB #10796)

CLYDE H. GUNN, III (MSB #5074)
CHRISTOPHER C. VAN CLEAVE (MSB #10796)
W. CORBAN GUNN (MSB #101752)
DAVID N. HARRIS, JR. (MSB #100790)
CORBAN, GUNN & VAN CLEAVE, P.L.L.C.
P.O. Drawer 1916
Biloxi, MS 39533-1916
Telephone: (228) 432-7826
Facsimile: (228) 456-0998
Email: christopher@cgvclaw.com

## CERTIFICATE OF SERVICE

I, undersigned counsel of record, hereby certify that I have this day electronically filed the foregoing with the Clerk of the Court using the EFC system which sent notification of such filing to the following:

B. Wayne Williams, Esq.
Dan W. Webb, Esq.
Roechelle R. Morgan
Paige C. Bush, Esq.
Webb, Sanders, & Williams, PLLC
363 North Broadway
Post Office Box 496
Tupelo, Mississippi 38802
(662) 844-2137 (off)
wwilliams@webbsanders.com
RRM@webbsanders.com

**Attorneys for State Farm Fire & Casualty Company
And Marshall J. Eleuterius**

Respectfully submitted, this the 23rd day of October, 2009.

DANIEL B. O'KEEFE, CELESTE A. FOSTER
O'KEEFE, AND THE DANCEL GROUP, INC.,
PLAINTIFFS

By: */s/ Christopher C. Van Cleave*
CHRISTOPHER C. VAN CLEAVE (MSB #10796)