UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF MISSISSIPPI
SOUTHERN DIVISION

UNITED STATES OF AMERICA
EX REL. CORI RIGSBY and KERRI RIGSBY                                    **RELATORS**

V.                                            CIVIL ACTION NO. 1:06CV0433 LTS-RHW

STATE FARM INSURANCE COMPANY, ET AL.                           **DEFENDANTS**

### MEMORANDUM OPINION

The Court has before it ten substantive motions, seven filed by State Farm Fire and Casualty Company (State Farm), two by Haag Engineering Co. (Haag), and one by the Relators.

The Relators' motion [206] asks the Court to clarify an order [1173] entered in *McIntosh v. State Farm Fire & Casualty Co.*, Civil Action Number 1:06cv1080 LTS-RHW. That order prohibited the Relators from testifying in civil suits against State Farm. Relators now ask the Court to indicate whether this prohibition would apply to their testimony in this action. Because this action differs substantially from the other civil actions brought against State Farm, I allowed the Relators to testify at the May 20 - 23, 2009, hearing on the pending motions to dismiss and for summary judgment. To the extent the Relators have relevant knowledge, they will be permitted to testify in all further proceedings in this action. To this extent, the Relators' motion for clarification [206] will be granted.

In its first motion [91], State Farm seeks dismissal of this action for lack of subject matter jurisdiction. Its second motion [96] is for summary judgment on the Relators' claim for retaliatory discharge from their employment. The third State Farm motion [98] seeks dismissal of this action under F.R.Civ.P. Rule 12(b)(6) and 9(b). Haag's two motions [106] [108] are essentially its joinder in State Farm's two motions [91] [98] to dismiss. My ruling on these two State Farm motions [91] [98] will also apply to Haag's motions [106] [108].

The next four State Farm motions seek the exclusion of the Relators' four expert witnesses: Patrick J. Fitzpatrick, Ph.D. [294]; Keith G. Blackwell, Ph.D. [296]; R. Ralph Sinno, Ph.D. [298]; and David J. Favre [300]. I will address the motions [294] [296] [298] [300] challenging the qualifications of the Relators' expert witnesses in a separate opinion.

Because I have gone outside the pleadings and heard evidence in support of and in opposition to the merits of State Farm's and Haag's motions to dismiss [91] [98] [106] [108], I will treat all of these as motions for summary judgment. The summary judgment standard will therefore apply, and the motions will be granted only if the movants, State Farm and Haag, meet their burden to show there is no genuine issue of material fact and they are entitled to judgment

-1-

**EXHIBIT 1**

as a matter of law.

In reaching the merits of these motions I will take into consideration the testimony of the witnesses during the hearing I conducted May 20 - 23; the exhibits placed in the record during the hearing; and the affidavits, depositions and other documents already in the record at the time of the hearing as exhibits in support of and in opposition to these motions.

## State Farm's Motion [91] and Haag's Motion [106]
## To Dismiss This Action for Lack of Subject Matter Jurisdiction

The False Claims Act, 31 U.S.C. §§ 3729 - 3733 (FCA or the Act), provides that a federal court has no jurisdiction to hear an FCA action brought by a private citizen and based on publicly disclosed information unless the individual bringing the action, the relator, is the original source of the information on which the claim is based. 31 U.S.C. §3730(e)(4) states:

> (A)     No court shall have jurisdiction over an action under this section based upon the public disclosure of allegations or transactions in a criminal, civil, or administrative hearing, in a congressional , administrative or [General] Accounting Office report, hearing, audit, or investigation, or from the news media, unless the action is brought by the Attorney General or the person bringing the action is an original source of the information.

> (B)     For purposes of this paragraph,"original source" means an individual who has direct and independent knowledge of the information on which the allegations are based and has voluntarily provided this information to the Government before filing an action under this section which is based upon the information.

The "information" referred to in paragraph (B) is the information in the Relators' amended complaint [16]. *Rockwell International Corp. v. United States*, 549 U.S. 457, 167 L.Ed.2d 190, 127 S.Ct. 1397 (2007) (*Rockwell*). I will assume, without deciding, these statutory provisions are applicable to Kerri Rigsby, the relator who has taken the lead in this action. I take this provisional approach because I am by no means certain this action is "based upon" the allegations made public by the Relators in the wake of Hurricane Katrina. While these public disclosures undoubtedly involved the same basic allegations made in the Amended Complaint, it is the Realtors who made the public disclosures. Thus the public disclosures are based upon the Relators' allegations and not the other way around.

In their amended complaint, the Relators allege two specific instances of the defendants' having presented false and fraudulent claims to the United States for reimbursement of payments State Farm made to settle flood damage claims under standard flood insurance policies (SFIP). One of these has been shown to be invalid. The sole remaining specifically-identified instance offered in support of the allegations of the amended complaint involves the claim of Thomas and

Pamela McIntosh (the McIntoshes).

The Relators charge the defendants presented a false and fraudulent claim for some portion of the $250,000 in flood insurance benefits paid to the McIntoshes for flood damage to their dwelling. The Relators acknowledge: 1) the McIntoshes' property sustained substantial flood damage; and 2) the flood damage was covered by a SFIP issued under the National Flood Insurance Program (NFIP). The Relators contend, and offer evidence, that the amount necessary to fully and fairly compensate the McIntoshes for this flood damage is far less than the policy limit of $250,000, the amount State Farm paid to settle this flood insurance claim. It is the difference between the flood damage the McIntoshes sustained and the policy limits payment State Farm made that the Relators charge is a false and fraudulent claim State Farm presented to the United States.

The allegations of the Amended Complaint go well beyond the two specific instances of misconduct specifically identified. The Relators charge State Farm and other defendants entered into a conspiracy to inflate or overstate the amount of flood damage that actually occurred (at the McIntosh property and other unspecified properties) and to pay those inflated amounts under the property owners' claims for wind damage by mischaracterizing part of the wind damage as flood damage. The United States reimburses State Farm for payments State Farm makes to settle flood policy claims, but the payments State Farm makes to settle wind damage claims under its homeowners policies are paid by State Farm on its own account. While the Relators contend this reduction in its obligations under its homeowners policies for wind damage was the motivation behind State Farm's overpayment of flood claims, the essential question in this action is whether there was an overpayment of the McIntosh flood claim (and perhaps other claims similar to the McIntosh claim), not the question of how the overpayment affected State Farm's obligations under its homeowners policies.

Wind damage is a risk covered under State Farm homeowners policies and excluded from NFIP policies. Water damage, including storm surge flooding, is a risk covered under NFIP flood policies, and, with very limited exceptions, is excluded from State Farm homeowners policies. Thus the coverages provided by these two types of policies are, and are intended to be, mutually exclusive. The NFIP authorizes State Farm and other private insurers to sell SFIPs and to adjust claims under both SFIPs and homeowners policies.

Following Hurricane Katrina, the Relators publicly charged that State Farm (and others named as defendants in the Relators' original complaint) deliberately overpaid flood insurance claims in order to reduce its own exposure for wind damage. These public allegations have the potential to bring the provisions of 31 U.S.C. §3730(e)(4) into play. Assuming the requirements of 31 U.S.C. §3730(e)(4) apply in this action, unless at least one of the Relators is the "original source" of the allegations in their amended complaint, this Court does not have subject matter jurisdiction to hear this action. Because this is a jurisdictional issue, the Court has a duty to determine whether either of the Relators qualifies as an "original source" within the meaning of

the Act. The Act defines an "original source" as someone who has "direct and independent knowledge" of the allegations on which the FCA claim is premised.

Based on the testimony of Kerri Rigsby, I find she meets the statutory requirement of having "direct and independent knowledge" of the allegations concerning the McIntosh flood claim. Kerri Rigsby therefore qualifies as an original source of the information on which this FCA claim is based. However, I have heard no evidence, and I find no evidence in the record before me, to support the conclusion that Cori Rigsby qualifies as an "original source." It appears to me Cori Rigsby's knowledge concerning the McIntosh claim was gained through her conversations with Kerri Rigsby. In these circumstances, Cori Rigsby's knowledge is neither direct nor independent. *See Hays v. Hoffman*, 325 F.3d 982 (8th Cir. 2003).

The requirement that a relator be an "original source" only comes into play when the FCA action is based upon "public disclosure of allegations or transactions in a criminal, civil, or administrative hearing, in a congressional , administrative or [General] Accounting Office report, hearing, audit, or investigation, or from the news media." The manifest purpose of this limitation is to bar actions that might be brought by members of the general public who have no connection with or first-hand knowledge of the underlying misconduct and who only learn of the misconduct from public information.

My inquiry concerning Cori Rigsby's standing and qualification to act as a relator in this action is not jurisdictional. The Court's subject matter jurisdiction is established by Kerri Rigsby's having qualified as an "original source" under the assumption 31 U.S.C. §3730(e)(4) applies. But, in my view, where, as here, the Relators are the source of the public disclosure at issue, the FCA action is not "based upon" the information the Relators made public after the storm. Both Relators' access to the information supporting their allegations the McIntosh flood claim was deliberately overpaid (Kerri Rigsby's direct and independent knowledge and Cori Rigsby's indirect knowledge) came before they made these allegations public. In these circumstances, the "original source" requirement of 31 U.S.C. §3730(e)(4) may not apply at all. *U.S. ex rel Grubbs v. Kanneganti*, 565 F.3d 180, 194 (5th Cir. 2009) *(Kanneganti)*

Because this is not a jurisdictional issue, I am inclined to grant Cori Rigsby the benefit of the doubt in these circumstances. In my view, there is a genuine issue of material fact concerning Cori Rigsby's standing as a Relator. At this juncture, on a motion for summary judgment and a necessarily limited evidentiary record, I find Cori Rigsby's lack of direct and independent knowledge of the McIntosh claim does not disqualify her from acting as one of the Relators in this action.

Kerri Rigsby is an experienced insurance adjustor who had been working  for Renfroe for approximately ten years at the time of Hurricane Katrina. She testified that within a few days after the storm, when State Farm was just beginning to adjust the losses under the SFIP policies and under its homeowners policies, she attended a meeting convened by State Farm. Kerri Rigsby testified that during this meeting the person giving instructions for adjustors and their supervisors

to follow told his audience Hurricane Katrina was a "water storm" and the adjustors should go out and "hit the limits" of flood insurance policies. Defendants deny these allegations.

Kerri Rigsby also testified State Farm representatives told her Haag had performed an analysis of the forces generated during Hurricane Katrina and this analysis determined the storm surge flooding preceded the highest storm winds by a considerable time, making it highly likely the insured properties had not been extensively damaged by the storm winds prior to their being damaged by storm surge flooding. Kerri Rigsby testified she accepted these instructions and assumed the Haag report was truthful and accurate, only to find out later this was not the case. The defendants also deny the substance of these allegations.

In mid-September, Kerri Rigsby accompanied the adjustor, Cody Perry (Perry), who first assessed the flood damage at the McIntosh property. She participated in the adjustment process by observing the adjustor's work, and she assisted in compiling notes of the room measurements the adjustor made as he moved through the first floor of the McIntosh home assessing the flood damage. The State Farm flood claim file for the McIntosh claim contained a detailed diagram of the McIntosh residence with measurements of the dimensions of all the first floor rooms. The flood file also contained a plethora of photographs of the damaged property.

By the time Cody Perry and Kerri Rigsby visited the McIntosh property, the McIntoshes were taking remedial measures to minimize their damages as is required under their State Farm homeowners policy. The McIntoshes had removed much of the damaged dry wall on the first floor and most of the debris from their home by the time Cody Perry and Kerri Rigsby arrived to inspect the property. The notes prepared during or just after the on-site inspection indicate Perry found evidence to support the conclusion the property was flooded to a depth of approximately five feet above the ground floor.

Based on the Perry's report and evaluation, State Farm paid the policy limits ($250,000 dwelling and $100,000 contents) to settle the McIntoshes flood damage claim and closed its file for the flood policy. Neither Perry, Kerri Rigsby, nor any other representative of State Farm or Renfroe made an item-by-item assessment of the damage to the McIntosh property. This type of item-by-item assessment is informally called a "stick built" estimate, and State Farm uses a software program called Exactimate to assist in calculating the damage when this type of evaluation is done. In evaluating the damage to the McIntosh property, State Farm relied upon a different software program called Exactotal. Exactotal does not yield a "stick built" or item-by-item estimate of damage. Rather, Exactotal makes an estimate of the damage when a property is a total loss (either actual or constructive). Based upon its Exactotal estimate, State Farm paid the limits of coverage under the McIntosh SFIP and closed its flood adjustment file for the McIntosh property. State Farm's wind damage file for the McIntosh property remained open. In due course State Farm submitted a claim for reimbursement to the United States, and the United States honored that claim.

Kerri Rigsby testified that on or about October 12, 2005 (approximately two weeks after

the inspection of the McIntosh property), Perry handed her an engineering report concerning the damage to the McIntosh property. The report was prepared by Brian Ford (Ford), an engineer employed by Forensic Analysis Engineering Corporation (Forensic), on October 10, 2005. Kerri Rigsby testified there was a Post-it note on the front page of the report indicating the report should not be put into the wind damage file, where engineering reports normally went, and the note also stated the report should not be discussed. Kerri Rigsby testified she had never before seen instructions similar to those she found on the Post-it note. She gathered from her conversation with Cody that he was asking her to take physical possession of the report and see it was handled properly.

Kerri Rigsby pulled the McIntosh wind damage file for the purpose of putting the Ford report into that file. Upon examining the contents of the wind damage file, she found a different engineering report, one prepared by John B. Kelly (Kelly), another Forensic employee. Kelly inspected the McIntosh property on October 18, 2005, and signed his report on October 20, 2005. In her experience it was unprecedented to have two engineering reports on a single property, and it was also very unusual to see an engineering report prepared just two days after the engineer, Kelly, inspected the property. Kerri Rigsby testified it usually required weeks after an engineer's on-site inspection to prepare and finalize an engineering report. Kerri Rigsby also testified she was surprised to find only ten days elapsed between the date the Ford report was signed and the date the Kelly report was submitted.

Once she had the two reports in hand, Kerri Rigsby testified she had a conversation with Alexis King (King), the State Farm supervisor in charge of the McIntosh claim. Kerri Rigsby testified King acknowledged she (Rigsby) was not supposed to have seen these two engineering reports. The two reports are very similar except for the conclusions drawn by the two engineers. Ford's report does not identify or discuss any substantial flood damage at the McIntosh property, and Ford reached the conclusion the damage to the property was caused by wind. Kelly's report agreed with Ford's conclusion there was considerable wind damage, but Kelly also reports he observed extensive damage from storm surge flooding.

Ultimately, these circumstances led Kerri Rigsby to conclude State Farm was wrongfully attempting to maximize its policyholders' flood damage claims (which are ultimately paid by the United States) in order to minimize the policyholders' wind damage claims (which are paid by State Farm). She also concluded the Haag report concerning the timing of the peak winds and the arrival of storm surge flooding was false and the report was done in furtherance of State Farm's plan to dishonestly identify wind damage as flood damage.

The defendants sharply contest the truth of Kerri Rigsby's allegations and of the conclusions she reached after seeing the two reports. The defendants' evidence established Katrina was a massive storm that devastated the Mississippi Gulf Coast and left many homes as 1) only foundations ("slabs"), 2) only pilings ("popsicle sticks"), or 3) empty shells ("cabanas"). The McIntosh dwelling did not come within any of these three categories. Although the McIntosh dwelling was extensively damaged by storm surge flooding, its exterior walls, roof, and interior

-6-

walls were still standing.

State Farm's witness Michael Farrier (Farrier), who was above both Kerri Rigsby and King in the State Farm chain of command, testified all State Farm's flood insurance adjusting practices, including the adjusting practices Perry followed in evaluating the flood damage at the McIntosh property, were consistent with applicable Federal Emergency Management Agency (FEMA) guidelines and instructions. Apparently, not all of the FEMA guidelines for adjusting SFIP losses were reduced to writing. State Farm asserts FEMA gave its blanket approval for the payment of flood policy limits for catastrophically damaged covered properties, where only foundations, pilings, or empty shells remained.

According to Farrier, FEMA also granted State Farm (and other write-your-own carriers) the authority, on a case-by-case basis, to pay SFIP limits of coverage for homes that were catastrophically damaged yet did not fit within the three categories designated as total losses, i.e. when the damage was sufficient to render the property a constructive total loss. Farrier testified that– in the case of a constructive total loss– FEMA's guidelines allowed State Farm to evaluate the flood damage without making an item by item, "stick built" estimate of the flood damage. According to Farrier, this was precisely the situation of the McIntosh residence, i.e. while the McIntosh property did not come within the three categories (slabs, pilings only, or empty shells) that were uniformly considered total losses, the flood damage to the McIntosh property was so extensive it justified State Farm's decision to consider the home a constructive total loss and pay the SFIP coverage limits without making a detailed estimate on an item-by-item basis.

State Farm asserts King, the individual who ordered the second engineering report on the McIntosh property, was fully justified in sending out a second engineer to evaluate the storm damage at the McIntosh property. King's deposition testimony was that the first report, the one Ford prepared, was inaccurate and incomplete in that it did not take note of the flood damage documented by Perry's inspection notes and the photographs in the flood file. King found the Ford report unacceptable, and she took steps to disqualify Ford's employer, Forensic, from further participation in adjusting State Farm claims. King relented in her initial decision to terminate State Farm's relationship with Forensic when Forensic agreed to send a different engineer (Kelly) to inspect the McIntosh property and evaluate the damage to the dwelling. Kelly testified his employer, Forensic, instructed him not to estimate the quantity of damage caused by wind or water, but only to determine the predominant cause of the damage to the McIntosh dwelling. Pursuant to these instructions, Kelly did not attempt to segregate and compare these different types of damage, and Kelly ventured no opinion on the dollar amount of flood damage he observed.

Based on the evidence I heard from the stand, particularly Kerri Rigsby's own testimony, it appears to me there is sufficient evidence to support the conclusion that she does indeed possess direct and independent knowledge of the facts she has alleged in support of the allegations in the Amended Complaint. This evidence is also sufficient to create a genuine issue of material fact on the merits of the Relators' substantive allegations.

State Farm's motion [91] and Haag's motion [106] to dismiss the complaint on the grounds that neither of the Relators qualifies as an "original source" will be denied.

**State Farm and Haag's Motions [98] [108]
To Dismiss Under F.R.Civ.P. 12(b)(6) and 9(b)**

Based on the evidence in the record, under the legal standard applicable to motions to dismiss under Rule 12(b)(6), it is clear to me the Relators have stated a claim upon which relief can be granted. I will turn, therefore, to consideration of these motions on the alternative grounds of failure to comply with the requirements of F.R.Civ.P. 9(b), which provides:

> (b)    Fraud or Mistake; Conditions of Mind. In alleging fraud or mistake, a party must state with particularity the circumstances constituting fraud or mistake. Malice, intent, knowledge, and other conditions of a person's mind may be alleged generally.

The heightened pleading standard of Rule 9(b) applies to actions brought under the FCA. *Kanneganti.* To satisfy the particularity requirement of F.R.Civ.P. 9(b), the Relators' pleadings must show the "who, what, when, where, and how of the alleged fraud." *U.S. ex rel. Rafizadeh v. Continental Common, Inc.*, 553 F.3d 869 (5th Cir. 2008), quoting *United States ex rel. Doe v. Dow Chem. Co.*, 343 F.3d at 328 (internal quotation marks and citations omitted). *Kanneganti* expresses these requirements as a showing of the "time, place, contents, and identity" of the alleged fraud and its perpetrator.

The Relators have alleged a specific instance that would, if proven, establish an FCA violation. Relators allege this was just one instance of a broader and more pervasive conspiracy among the defendants to submit many other claims of this type. I am of the opinion the allegations concerning the McIntosh claim satisfy the heightened pleading standard of Rule 9(b), as that standard has been articulated in *Kanneganti.*

Kerri Rigsby testified King is the individual who ordered the second engineering report on the McIntosh property. King is a State Farm supervisor who worked closely with both State Farm adjusters and Renfroe engineers to investigate the merits of flood claims and homeowners claims after Hurricane Katrina. King freely acknowledges she ordered the second engineering report, and she asserts she was fully justified in doing so. In King's opinion the Ford engineering report was flawed in that it did not include the substantial flood damage documented in State Farm's closed flood insurance file. Relators ascribe a different motive behind King's decision to order a second report. This creates a genuine issue of material fact that cannot be resolved summarily.

Kerri Rigsby also testified there was a meeting at which she asserts these adjusters were instructed to "hit the limits" on flood policies, and she identified a report prepared by Haag concerning the order in which the storm forces affected the insured properties. She testified she later learned the substance of the Haag report was false. The preparation of this report and the

instructions to the adjustors to "hit the limits" of flood policies and to adjust claims under the assumption the Haag report was accurate are alleged to be part of a conspiracy intended to facilitate the presentation of inflated flood damage claims to the United States. Kerri Rigsby testified Perry adjusted the McIntosh flood claim in accordance with State Farm's instruction to "hit the limits," and she approved Perry's report under the assumption the Haag report was truthful and accurate. State Farm's denial of these allegations leaves a genuine issue of material fact that must be resolved by further proceedings.

With respect to the McIntosh claim, it is my conclusion the Realtors' pleadings are sufficient to inform the defendants of the charges the Relators are making and give the defendants sufficient information to mount their defense to the Relators' allegations. Because this action will be, at least at this juncture, limited to the McIntosh claim, for reasons I will discuss below, I find the Amended Complaint, when considered with the extensive deposition testimony taken from Kerri Rigsby and with the documentation now on file, has stated the Relators' FCA claim with sufficient particularity to satisfy the requirements of F.R.Civ.P. 9(b).

### State Farm's Motion for Summary Judgment [96] on the Relators' Claim for Retaliatory Discharge from Their Employment

31 U.S.C. §3730(h) of the FCA, sometimes known as the "whistleblower" provision, is intended to prevent adverse job actions against employees who assist in or bring actions under the FCA. This subsection of the act provides:

> (h) Any employee who is discharged, demoted, suspended, threatened, harassed, or in any other manner discriminated against in the terms and conditions of employment by his or her employer because of any lawful acts done by the employee on behalf of the employee or others in furtherance of an action under this section, including investigation for, initiation of, testimony for, or assistance in an action filed or to be filed under this section, shall be entitled to all relief necessary to make the employee whole. Such relief shall include reinstatement with the same seniority status such employee would have had but for the discrimination, 2 times the amount of back pay, interest on the back pay, and compensation for any special damages sustained as a result of the discrimination, including litigation costs and reasonable attorneys' fees. An employee may bring an action in the appropriate district court of the United States for the relief provided in this subsection.

The Relators acknowledge their employment contract was not with State Farm but with Renfroe, the party with whom the Relators recently reached a comprehensive settlement agreement. I have been unable to find any FCA case in which any party other than the whistleblower's direct employer has been found liable under 31 U.S.C. §3730(h). There is no evidence in this record to indicate State Farm had the authority to terminate the Relators'

employment status. Accordingly, I will grant State Farm's motion for summary judgment on this portion of the Relators' claim.

### Scope of Further Proceedings

*Rockwell*, 549 U.S. at 476, indicates any relator in an FCA case is limited to pursuing claims of which he has first hand knowledge, and each claim must be considered on its own merits:

> Section 3730(e)(4) [of the FCA] does not permit jurisdiction in gross just because a relator is an original source with respect to some claim. We, along with every court to have addressed the question, conclude that §3730(e)(4) does not permit such claim smuggling.

In their original complaint, the Relators alleged a vast conspiracy among several insurers to accomplish the same ends they allege State Farm sought to bring about. The amended complaint was also very broad, alleging misconduct by firms and individuals who have since been voluntarily dismissed. State Farm is the only defendant now charged with having presented a false claim, and the allegations of the Amended Complaint identify only one specific instance of misconduct: the McIntosh claim.

The McIntosh claim is the only instance of State Farm's having submitted an allegedly false claim of which the Relator Kerri Rigsby has first hand knowledge, i.e. direct and independent knowledge sufficient to support the Court's subject matter jurisdiction, in light of the decision of the United States not to intervene. Yet the Relators' complaint alleges McIntosh was just one among many similar false claims State Farm and the other defendants conspired to submit. In order to protect the interests of both parties, I must strike a balance between the Relators' interest in identifying these other allegedly false claims and the defendants' interest in preventing a far ranging and expensive discovery process that relates only to claims that are not, for now, specifically identified.

Accordingly, I will limit the presentation of evidence in this action to facts relevant to the McIntosh claim. In light of the extensive discovery that has already been conducted with respect to this claim, I do not believe there will be much in the way of additional preparation necessary to bring this case to trial. I will therefore refer this action to United States Magistrate Judge Walker to establish a pre-trial schedule so any additional discovery can be completed before the end of this calendar year. In the event the Relators prevail on the merits of their allegations concerning the McIntosh claim, I will then consider whether additional discovery and further proceedings are warranted.

In the meanwhile, so I may know the outer limits of the potential claims involved in this action, I will require State Farm to submit, *in camera*, a list containing the name of the insured, the address of the property, and the amount of flood insurance paid, for all SFIP claims that meet

the following criteria:

A)  The insured property did not fall within any of the three categories of storm damage for which FEMA approved payment of SFIP limits, i.e. insured dwellings that were not left as slabs, pilings, or empty shells; and

B)  For which SFIP limits were paid on the grounds the property was a constructive total loss; and

C)  For which no "stick built" or Exactimate estimation of the flood damage was made before the SFIP limits were paid.

An appropriate order will be entered.

**DECIDED**, this 10th day of August, 2009.

s/ L. T. Senter, Jr.
L. T. SENTER, JR.
SENIOR JUDGE

DATE          September 10, 2005

To:           State Farm Claim Associates handling CAT PL in the Southern Zone

From:         Property and Casualty Claim Consulting Services

Subject:      Claim Handling Protocol


**********************************ACTION REQUESTED**********************************

## SUMMARY
Available data indicates that the coastal counties of Mississippi and Alabama received substantial damage from Hurricane Katrina from both high velocity winds and an extremely large storm surge.

## ACTION NEEDED
The damage to inured properties will fall into one of four categories:
- Damage to the property was caused exclusively by windstorm.
- Damage to the property was caused exclusively by flooding
- Damage to the property was caused by a combination of the two and this damage is distinguishable.
- Damage to the property that may have been caused by either windstorm or flood or a combination of the two and it is difficult to conclusively determine causation.

This protocol has been developed to outline the process needed to make the necessary determination of coverage.

## DETAIL

Each claim will be handled on its merits. A complete investigation coupled with appropriate file documentation is required in all cases where there is a question of coverage. We will consider all information available in making a coverage determination. This information will include but is not limited to:

- Evidence gathered at the on site inspection. This includes documentation of all physical evidence such as water lines, an examination of the debris, and an analysis of the physical damage to the structure.
- Evidence gathered at neighboring locations.
- Data obtained from reports describing damage to the area.
- Testimony from witnesses and policyholders.
- If necessary experts will be retained to assist in the coverage determination.


**EXHIBIT 2**

## Damage Caused Exclusively by Windstorm

When the investigation indicates that the damage was caused exclusively by windstorm the claim will be handle under the applicable provisions of the involved property policy. Consideration should be given to determine if a hurricane deductible or a windstorm or hail exclusion endorsement is involved and the claim handled accordingly.

## Damage Caused Exclusively by Flooding

When the investigation indicates that the damage was caused by flooding and damage caused by windstorm can be ruled out the claim under the appropriate property policy should be denied. If there is a policy that covers damage caused by flood or if we have a claim set up under the flood policy then the claim should be handled consistent with the terms of those policies and as outlined in Operation Guide 71-06.

## Damage Caused by a Combination of Windstorm and Flooding and the Damage is Distinguishable

The damage should be clearly documented in the claim file. The claim representative should calculate the damage attributed to each peril and apportion the adjustment accordingly. In those cases where we have both the windstorm and flood policy payments will issued under the applicable policy.

## Damage to the Property That May Have Been Caused by Either Windstorm or Flood or a Combination of the Two and it is difficult to conclusively determine Causation

In claims of this nature it is critical to conduct a ~~complete~~ *detailed* investigation. The information gathered in the investigation should then be analyzed to make the appropriate coverage determination.

*hanger*

Both Mississippi and Alabama courts have upheld the anti-concurrent causation language in our property policies. This means that loss caused by flooding is excluded "regardless of; (a) the cause of the loss; or (b) the cause of the excluded event; or (c) whether other caused acted concurrently or in any sequence with the excluded event to produce the loss; or (d) whether the event occurs suddenly or gradually, involves isolated or widespread damage, arises from natural or external forces, or occurs as a result to any combination of these:..."

There is no coverage for damage caused by flooding even if the flooding occurred in concert with damaged caused by windstorm. If the analysis of the investigation concludes that the windstorm damage occurred separate from and in addition to the damage caused by flood then the claim should be handled as outlined above.

It is our burden to prove that the excluded damage (flood) caused the loss. Once that burden has been met then it is the burden of the policyholder to prove that there was

also a covered loss (windstorm). In those cases where our investigation determines that the predominance of evidence indicates that there is no known windstorm damage then the claim should be denied under the appropriate property policy and if applicable, covered under the flood policy.

It goes with out saying that this analysis will be complicated and should be done on an individual file bases. In cases where the investigation is ongoing but we can conclude that the structure was damaged by flood, payment should be made under any applicable flood policy. In those cases payment can be made for ALE or Loss of Income under the property policy until the final coverage decision is made. The policyholder should be advised in writing that the investigation is ongoing, no coverage decision has been made and in the event that it is determined that the is no covered damage no further payment will be made on ALE or Loss of Income

All claims in this category must be reviewed by the Claim Team Manager before a final decision is made. ~~The Claim Section Manager or Coordinator~~ should be involved in any claim where it is deemed necessary to retain an expert to assist in the determination of causation.

Management -

### FOR MORE INFORMATION

Any question on this protocol should be directed to your Claim Team Manager.

    C.  P & C Claims Executive
        P & C Claims Directors and Consultants
        Dakin Kinser
        Joe Fincher
        Tyrone Smith
        Tom Larkin
        Sue Cook
        Jim Burwell
        CAT Services Section & Team Managers
        Zone Section Managers

Date:        September 13, 2005

To:          State Farm Claim Associates handling CAT PL in the Central and
             Southern Zones

From:        Property and Casualty Claim Consulting Services

Subject:     Wind/Water Claim Handling Protocol

••••••••••••••••••••••••••••••••••ACTION REQUIRED••••••••••••••••••••••••••••••••••••••

**Summary**
Because of the combination of wind and water damages many homes sustained from
Hurricane Katrina, the following materials have been developed and are intended for use
as a guide for handling various wind and/or water claims in Louisiana, Mississippi and
Alabama.

**Action**
The protocol below outlines the process that should be used for determination of
coverage in those locations.

**Protocol Detail**
Each claim should be handled on its merits. A causation investigation should be
conducted and appropriate claim file documentation is required. Any available
information should be considered in making a coverage determination. This information
will include, but is not limited to:

  • Evidence gathered at the on site inspection. This includes documentation of
    physical evidence such as water lines, an examination of the debris, and an
    analysis of the physical damage to the structure.
  • Evidence gathered at neighboring locations.
  • Data obtained from reports describing damage to the area.
  • Information from witnesses and policyholders.
  • Input from experts that may be retained to provide guidance.

The damage to insured properties will fall into the following categories and should be
handled as detailed below:

  • Damage to the property was caused by windstorm.
  • Damage to separate portions of the property can be attributed to either
    windstorm or excluded water.
  • Damage to the property was caused by excluded water; with no available
    coverage.
  • Damage to the property was caused by flood waters; covered by an available
    flood policy.

Damage Caused by Windstorm
When the investigation indicates that the damage was caused by windstorm, the claim
will be handled under the applicable provisions of the involved property policy.
Consideration should be given to determine if a hurricane deductible or a windstorm or
hail exclusion endorsement is involved and the claim handled accordingly.

Damage to Separate Portions with Distinguishable Wind or Excluded Water
Each type of damage should be documented in the claim file.  The claim representative
should calculate the separate damage attributable to each peril and handle the
adjustment accordingly.  In those cases where the policyholder has policies for both a
windstorm and a flood, payments should be issued under the applicable policy.

Damage Caused by Excluded Water
When the investigation indicates that the damage was caused by excluded water and
the claim investigation does not reveal independent windstorm damage to separate
portions of the property, there is no coverage available under the homeowners policy
pursuant to the following language in *Section 1 Losses Not Insured*:

"2. We do not insure under any coverage for any loss which would not have  occurred in
the absence of one or more of the following excluded events.  We do not insure for such
loss regardless of; (a) the cause of the excluded event; or (b) other causes of the loss; or
(c) whether other causes acted concurrently or in any sequence with the excluded event
to produce the loss; or (d) whether the event occurs suddenly or gradually, involves
isolated or widespread damage, arises from natural or external forces, or occurs as a
result to any combination of these:

c. Water Damage, meaning:
            (1)  flood, surface water, waves, tidal water, tsunami, seiche, overflow of a
                 body of water, or spray from any of these, all whether driven by wind or
                 not . . ."

Other Losses Not Insured *may be* applicable, including 2.c.(2) & (3), 3.(a), (b) & (c).

Damage to Property Caused by Flood Waters with available Flood Policy
Where wind acts concurrently with flooding to cause damage to the insured property,
coverage for the loss exists only under flood coverage, if available.  The flood damage
claim should be handled consistent with the terms of the flood policy providing coverage
as outlined in Operation Guide 71-06.

Claims where the causation investigation is ongoing
Payment can be made under a reservation of rights for ALE or Loss of Income under the
property policy until the final coverage decision is made.  The policyholder should be
advised in writing that:
   • The investigation is ongoing.
   • No coverage decision has been made.
   • In the event it is determined that there is no covered damage, no further
     payment will be made on ALE or Loss of Income.
   • They may undertake an independent investigation.

All claims in this category must be reviewed by the Claim Team Manager before a final
decision is made.  Management should be involved in any claim where it is deemed
necessary to retain an expert to assist in the determination of causation.

**For More Information**
Any question on this protocol should be directed to your Claim Team Manager.


C.  P & C Claims Executive
    Southern Zone Executive & Claim Managers
    Central Zone Executive & Claim Managers
    P & C Claims Directors and Consultants
    Catastrophe Services Claim Managers
    Catastrophe Services Section & Team Managers
    Zone Section Managers

**From:**       Mark Wilcox
**Sent:**       Friday, October 28, 2005 5:48 PM
**Subject:**    Engineering reports

**Attachments:**    This is a suggested format for the written evaluation of a structure.doc
Some of you have queried us concerning the content of the report, the
length and style.  Attached is a document that we believe answers those
questions.  Please consider this format in preparing any future reports and
mail them with your invoice to the requestor.  If you have any questions
please let me know.



This is a suggested
format for...

PLEASE NOTE!  As of Wednesday November 2 I will no longer be your
contact. Please contact David Haddock 205.503.0946 or
david.l.haddock.BFIO@statefarm.com.  I've enjoyed working with you and
hope to see you again.

Mark Wilcox
Construction Consultant
(309) 212-7735
Nextel: 205-503-0904
Email:  mark.wilcox.ax1h@statefarm.com

**EXHIBIT 3**

This is a suggested format for the written evaluation of a structure. Please be sure to include the header information and reference the loss by address and claim number. An opening paragraph is appropriate detailing your assignment and disclaimer.

## DESCRIPTION

The (insert policyholder's name) residence was a wood-framed, single family dwelling erected on a concrete slab foundation. Exterior walls were clad with white painted wood siding. The house was rectangular in plan with the long dimension oriented east/west; the front of the house faced north. The gable-type roof was covered with three tab asphalt shingles. A large carport was located to the west of the house. It had a flat roof covered with a mineral coated, sheet-type membrane. The house was situated in a heavily wooded residential area about one block from the Gulf of Mexico.

## WEATHER DATA

(Insert your weather data similar to this)

Hurricane Katrina struck southeast Louisiana during the early morning hours on August 29, 2005, as a Category 4 hurricane on the Saffir-Simpson scale. The eye made landfall in Plaquemines Parish, Louisiana, just south of the town of Buras with sustained winds of around 140 MPH at 6:10 AM. The strongest winds were associated with the east eyewall which passed to the east of New Orleans. As Katrina moved northward, dry air was entrained into the circulation and wind speeds decreased substantially. Meanwhile, the storm surge increased rapidly along the Mississippi coast in advance of the hurricane hours before landfall of the eyewall.

Hurricane Katrina made a second landfall at the mouth of the Pearl River between Louisiana and Mississippi around 10:00 AM as a Category 3 hurricane with winds of around 120 MPH (estimated at 33 feet above ground in the open). The west eyewall passed over Slidell, Louisiana, whereas the east eyewall passed over Bay St. Louis, Mississippi. Winds in Bay St. Louis were initially from the east, then switched to the southeast and south as the eye made landfall. A record storm surge occurred to the east of the eye with the Gulf waters rising more than 31 feet in Waveland. The storm

surge preceded and accompanied the strongest winds. Also, the storm surge reached its peak along with the strongest winds.

## OBSERVATIONS / CONCLUSIONS

Based on our inspection, we made the following observations and reached the following conclusions:

1.  The house was completely destroyed and was lying in sections on and just north of the slab foundation. The south wall had rotated over to the north trapping the house contents. Windows on the south wall near the east side of the house were broken. Windows on the west side of the house were not broken and contained screens. A wooden fence was lying on top of the south wall. Close examination of the foundation revealed the base of the south wall had a wood plate that was bolted to the slab on four foot centers. Portions of the bottom plate remained. Wall studs had been nailed but not strapped to the plate or into the foundation. As a result, the walls failed at this connection when the house was overloaded from forces from the south. A sliding glass door to the shower/tub was noticed lying unbroken near the south edge of the slab with a section of wood fence sandwiched in between. There was a door deposited on top of the wood fence. Flotsam was noted on top of the wood fence.

2.  A section of the roof was flipped over and lying upside down near the north end of the slab. The glass skylight remained intact and was not broken. A section of the flat roof was lying on top of the residence upright with the roofing still intact.

3.  The ceiling framing and ductwork were located in the front yard and were upright. Farther northeast on the front lawn was a section of the roof that remained upright with shingles still attached to the decking.

4.  Homes south and east of the residence also were destroyed and had exhibited similar failures with the roof lying on top of the walls and contents. We examined the homes to the south, east, and southeast. All of these homes had the walls washed out by the storm surge, and

M